**MEMORANDUM RELATING TO THE "TOTAL RECALL" TELEPHONE RECORDING SYSTEM AT THE PROVIDENCE PUBLIC SAFETY COMPLEX**

**FROM:** RONALD R. GENDRON, SP. ASSISTANT ATTORNEY GENERAL

**TO:** PATRICK LYNCH, ATTORNEY GENERAL

**CC:** GERALD COYNE, DEPUTY ATTORNEY GENERAL
PAUL DALY, CHIEF, CRIMINAL DIVISION

**DATE:** JANUARY 2, 2004

---

I. Introduction.

This memorandum contains findings and conclusions regarding whether a willful violation of the General Laws of Rhode Island occurred with respect to the installation and use of a telephone recording system, known as Total Recall, at the Providence Public Safety Complex. The telephone and recording systems were furnished and installed by Expanets, Inc., based in Houston, Texas. The findings and conclusions contained herein were reached after reviewing several hundred pages of documents submitted to me by the Rhode Island State Police following their investigation into this matter. The materials reviewed included the following: a Rhode Island State Police Forensic Report relating to the Public Safety Complex telephone system, Total Recall, and recorded calls accessed through Total Recall; police reports by members of the Rhode Island State Police; witness statements taken by the Rhode Island State Police from personnel at Expanets, the Providence Telecommunications Department, the office of the Commissioner of Public



DRAFT

Exhibit F

Safety, and the Providence Police and Fire Departments; literature pertaining to the Total Recall telephone recording system; internal memoranda and e-mails generated by personnel at the Providence Police and Fire Departments and Department of Communications; technical logs relating to the Total Recall system; and relevant statutes and case law.

II. Procurement and Installation of Total Recall

Before and during the time that the Public Safety Complex was being constructed, hundreds of planning meetings occurred – attended by various high-ranking officials from the Fire, Police, and Telecommunications Departments – relating to all aspects of the new complex, including its telephone system and the ability to record telephone calls coming into the complex. It appears that it was generally understood that certain telephone lines in the new complex, including emergency response lines, would be recorded, as is common practice generally in virtually all police and fire stations. However, from a review of the witness statements and documentary evidence provided, it is unclear exactly who, if anyone, from the Providence Police and Fire Departments and Commissioner of Public Safety's Office actually requested that an all-extension telephone recording system be installed, and activated, in the new complex. When interviewed, Colonel Urbano Prignano and Chief James Rattigan, then-chiefs of the Police and Fire Departments, respectively, and then-Commissioner of the Office of Public Safety, John Partington, all denied any knowledge of or involvement in requesting such a recording system, drafting bid specifications for the recording system, its purchase, installation, or its activation, even though each individual understood certain lines within the Public Safety Complex would be recorded, as they were in the Fountain Street facility. Although this fact, if true, is indicative of a disturbing lack of communication and exchange of information between the then-Director of the Telecommunications Department, Manuel Vieira, and Colonel Urbano Prignano, Chief James Rattigan, and Public Safety Commissioner John Partington – whose agencies were to be housed in the new Public Safety Complex and, thus, their telephone conversations monitored by Total Recall – there is no credible



DRAFT

evidence in existence that refutes their assertion of lack of involvement in the requisitioning or installation of the all-extension recording system.

The totality of the evidence submitted appears to clearly indicate that the Director of the Telecommunications Department, Manuel Rivera, was responsible for requisitioning a telephone recording system, like Total Recall, that had the ability to record every line in the new Public Safety Complex, ordering its installation, and allowing the system to become operational without giving formal notification to the Chiefs of the Police and Fire Departments, or the Commissioner of Public Safety, that the system was operating and recording virtually every incoming or outgoing telephone call in the complex. Despite this rather incontrovertible evidence, it also appears that, immediately after the controversy surrounding the telephone recording system garnered media attention, Director Vieira, in conversations with several individuals, attempted to distance himself from the acquisition, installation, and activation of the recording system while minimizing his knowledge of the system's recording capability and the extent to which it was being used. Furthermore, it does not appear that Director Vieira consulted with the Providence City Solicitor's office to obtain an opinion with respect to the legality of such a system before its purchase or activation, or to develop an official policy with respect to the system's usage. Mr. Vieira declined to give a statement to the Rhode Island State Police or otherwise assist them in their investigation into this matter.

Conversely, however, it also does not appear that the acquisition of the Total Recall system occurred in a fashion inconsistent with normal city purchasing procedures or in an otherwise clandestine manner. Indeed, during the construction of the Public Safety Complex, a formal Request for Proposal was drafted that included the specifications for the desired telephone system. Because the initial Request for Proposal relating to the complex's telephone system did not include the requirement of a telephone recording system, a Telecommunications Department employee – at Director Vieira's request – prepared a second set of specifications relating to the additional requirement of a telephone recording system, which was attached to the initial Request for Proposal as an addendum. In accord with normal procedure, this Request for Proposal and recording-



DRAFT

system addendum was forwarded to Mr. Alan Sepe, then-Acting Director of the Providence Department of Public Property. Thereafter, Mr. Sepe conducted pre-bid meetings that were attended by several telecommunications vendors. At these meetings, the telephone system's requirements – including the need for a telephone recording system – were discussed openly. Of the approximately 7 vendors that expressed interest in the proposal, 6 submitted bids on the project. Although not the lowest bidder overall, Expanets won the bid because its product met all bid specifications, including the telephone recording system. Although lower, the bids of other vendors were rejected for failure to meet the general Request for Proposal specifications or failing to bid on the recording system.

Ultimately, the Telecommunications Department was responsible for choosing the vendor that satisfied its Request for Proposal requirements. A January 8, 2002 letter from Director Vieira to Acting Director Sepe indicated that the Telecommunications Department was selecting Expanets based on the fact that they were the lowest bidder that met all bid specifications for a total phone system solution, which included a 500-channel telephone voice recording system. Expanets was awarded the telephone system contract, which included Total Recall, by the Board of Contract & Supply on January 14, 2002. (See attached correspondence). Expanets installed total recall in May of 2002 and it became operational shortly thereafter.

Additionally, although there was no formal notification from the Telecommunications Department to all personnel in the Public Safety Complex that the majority of lines in the complex were being recorded, there is also no evidence that shows affirmative steps were taken to intentionally conceal this information or prevent its dissemination. As previously mentioned, numerous planning meetings occurred prior to the opening of the Public Safety Complex at which various issues, including telecommunications, were discussed. Statements provided by several witnesses who were in attendance at some of those meetings indicate that the issue of telephone-line recording was often discussed openly. While it may not have been formally stated outright, it seems that it was fairly common knowledge that telephone lines in the new Public Safety Complex would be recorded, although the magnitude and extent of such



DRAFT

recording may not have been fully understood by all.

In his statement to the Rhode Island State Police, (Ret.) Major Dennis Simoneau recalled attending "at least two, if not three" meetings, attended by "dozens" of people, at which various design issues relating to the new Public Safety Complex were discussed, including the call-recording ability of the complex's telephone system. He recalls Director Vieira being present at at least one of the meetings during which telephone recording ability was discussed, and questioned Director Vieira about whether recorded lines would be equipped with an audible signal that alerted callers that the call was being recorded. (As an aside, it should be noted that the Total Recall system did <u>not</u> have the capability of alerting callers of active recording by means of an audible 'beep.' Although Telecommunications Department employees were aware, through Expanets trainings, that Total Recall could be configured to verbally announce to callers that their calls were being recorded, this feature was apparently never utilized). Based upon information gleaned from these meetings, prior to moving into the new Public Safety Complex, on July 22, 2002 at 2:48 p.m., Simoneau prudently sent out a department-wide email that contained, inter alia, the following notification, "Know that all telephone lines in the new station are recorded and thus speak professionally at all times. [Desk Sergeants] please alert all of your clerks of this fact." From the recipient list relating to this email, it appears that this email was delivered to and received by over 500 Police Department and Telecommunications Department personnel. (See attached copy of email and recipient list). According to Simoneau, at the time he composed this email at the former Providence Public Safety Complex on Fountain Street, he did not know whether all lines in the new Public Safety Complex would in fact be recorded (and did not in fact know they were being recorded prior to the commencement of the instant investigation) but, out of an abundance of caution, decided to affirmatively state that all calls were recorded so that all recipients of the email would conduct their telephone conversations accordingly.

<u>III. Public Safety Complex Telephone System and Total Recall</u>

As stated earlier, the telephone system contract at the Providence Safety Complex



DRAFT

was awarded to Expanets, based in Houston, Texas. The basic telephone system product provided by Expanets for the Public Safety Complex incorporates a PBX trunk line and, in addition to functioning as a conventional telephone system, also has the ability to count the number of calls made on the system, the calls made on each extension of the system, and the duration of those calls, although this so-called 'call accounting' feature was not initially operating when system was first activated. The basic telephone system, however, does not have the independent ability to monitor conversations during a telephone call or to record conversations.

Total Recall is described in company literature by Expanets as a "digital, Web-based, call logging software system[.]" Although Expanets does not manufacture the Total Recall system, they have a business affiliation with the company that does and, consequently, offers the Total Recall system to customers as part of their solution for a total telephone system product. Total Recall is a recording system that, when integrated with a telephone system, has the ability to record conversations occurring during all incoming or outgoing telephone calls on the main telephone 'trunk' line that services a building, including those conversations occurring on every telephone extension attached to the trunk line. Equipped with 70 gigabytes of memory, the Public Safety Complex's Total Recall server was capable of recording approximately 35,000 storage hours of telephone calls. Total Recall does not have the ability to real-time monitor a telephone conversation as it is transpiring, nor is it able to record 'station-to-station' calls that are made within the building itself. The purchaser of the Total Recall system designates those telephone lines or extensions that are to be recorded and Expanets installs this database into the Total Recall system. After the initial database is installed and the system is operational, the customer can then add or remove extensions for recording purposes, as the customer desires.

The Total Recall system is a network-based system that allows designated users to retrieve calls through a personal computer ("PC") by accessing a web-based application. Total Recall records telephonic conversations digitally and stores them on the Total Recall server as digital audio files, formatted as .WAV files. A designated user can then enter the Internet (or 'IP') address of the Total Recall server into an Internet browser, like



DRAFT

Microsoft Internet Explorer, and visit the web-application, or "login," page of Total Recall. Once a designated user enters a valid login name and password, the user can locate recorded calls stored on the Total Recall server by entering specific search parameters (e.g., time and date). The server will then generate a list of hyperlinks (each representing a recorded telephone call) corresponding to those calls that match the search parameters. A mouse click on a hyperlink activates the PC's media player and plays the audio file of the recorded call. These audio files can be accessed and listened to through the use of any internet-connected PC equipped with a sound card and speakers, downloaded onto a hard drive, or written on to a compact disc through the use of a compact disc writer and a recordable compact disc. Although it is possible to listen to .WAV files of recorded conversations directly from the Total Recall server, it was not possible to do this on the Public Safety Complex's Total Recall server because it was not equipped with a sound card or speakers. (It should be noted that there are 2 other means of accessing the Total Recall server: 1) TCP/IP access – Public Safety Complex Total Recall system was not equipped with this means of access, and 2) Telephone Modem Access – this was used exclusively by Expanets employees for routine troubleshooting, maintenance, and quality control. No Telecommunications Department employee or other City of Providence employee had access to the system through this method).

A very limited number of people had 'administrative rights' on the Total Recall system. Those with administrative rights are able to add, delete, or modify recorded telephone extensions on the server, and can also access or download recorded calls stored on the server. Of the 8 user logins identified on the system, 2 were assigned to Expanets employees, and the remaining 6 were assigned to Telecommunications Department employees. Director Vieira did not have administrative rights on the system.

The two servers that comprised the Total Recall system were located in a utility room on the second floor of the Public Safety Complex. Although access to the utility room was restricted due to the costly and technical equipment contained therein and a log was kept of those who accessed the room, the room was accessed frequently by a number of individuals for various purposes. There is no evidence that the Total Recall system



DRAFT

was covertly secreted in a little known and inaccessible room within the Public Safety Complex.

It appears that Total Recall was recording the vast majority of the telephone extensions within the Public Safety Complex. Following the initial installation and activation of Total Recall, designated Telecommunications Department employees with administrative rights removed certain extensions from the list of recorded extensions in the normal course of business.

It is significant to note that Total Recall did not record telephones located in the male, female, and juvenile detention areas of the Public Safety Complex and intended for use by detained persons. The telephones found in those detention cells are maintained by TIP Inmate Phone, Inc. of Texas, a distinct company that is unaffiliated with Expanets or Total Recall. Because those telephones are not a part of the PBX telephone system supplied by Expanets, they were not within the ambit of Total Recall's recording capability. There is no evidence whatsoever which indicates that any telephone call by any person detained within the Public Safety Complex was recorded or, more importantly, heard by anyone other than the intended recipient of the telephone call.

<u>IV. Recorded Calls Accessed on Total Recall</u>

Total Recall was activated on May 23, 2002 and archived its first call at 4:12:26 p.m. on that date. Substantial archiving activity on the Total Recall server. however. did not commence until months later when the Police and Fire Departments and other agencies moved into the building. The last call archived occurred on February 10, 2003 at 4:47:15 p.m., when the Total Recall system was disconnected. During its time in operation, Total Recall archived 754,564 calls.

In his <u>Forensic Report</u> prepared in relation to this investigation, Detective John Killian, of the Rhode Island State Police Computer Crimes Unit, first sought to determine which of the 754,564 archived calls were accessed after their creation. With the technical assistance of an Expanets employee, Detective Killian concluded that 83.552 archived calls had been accessed. It should be noted, however, that the mere fact that a call was



DRAFT

'accessed' does not necessarily mean that the audio file of that call was activated and played audibly. Call accesses can be attributable to a variety of reasons, such as troubleshooting, remote routine maintenance by Expanets employees, etc. With this in mind, Detective Killian then further refined his inquiry to determine which of those accessed calls were accessed and played audibly with "malicious [or] surreptitious intent." In doing so, Detective Killian employed what can only be described as an exhaustive methodology that included analysis of "service/trouble-shooting audio file type accesses" and cross-referencing with "testimonial evidence, knowledge of operating system characteristics and configuration, web browser history(s), Expanets telephone/modem connection logs, and Expanets service logs," in addition to "[t]ime synchronization between data" relating to "[t]ime stamped data from Expanets, the Total Recall server and other seized computers..." Detective Killian's Forensic Report is attached hereto and its findings and conclusions are incorporated herein.

Following his analysis, Detective Killian concluded, "[b]ased on the above methodology and analysis to date, this examination and review did not identify Total Recall audio files that appear to have been accessed with malicious/surreptitious intent." It is worthy of note that it was determined that a very small number of accessed calls were activated and played audibly or downloaded and written on to a compact disc. A review of the testimonial evidence indicates, however, that these instances are attributable to requests made to the Telecommunications Department for a copy of the recorded conversation by a participant to the conversation, or were ordered by officials within the Providence Police or Fire Departments for legitimate business purposes. There is no evidence to suggest that any accessed call was played audibly or downloaded and recorded either without the consent of a call participant or for a criminal, malicious, or non-business-related reason.

## V. Statutes and Relevant Case Law

The recording of the telephone calls at issue in this investigation falls within the purview of two inter-related statutes contained in the General Laws of Rhode Island. The



DRAFT

interception of wire, electronic, or oral communications in Rhode Island is governed by Rhode Island General Law sec. 11-35-21, entitled "Unauthorized interception, disclosure, or use of wire, electronic, or oral communication," which provides, in pertinent part, as follows:

> (a) Except as otherwise specifically provided in chapter 5.1 of title 12, any person: (1) who willfully intercepts, attempts to intercept, or procures any other person to intercept or attempt to intercept, any wire, electronic, or oral communication; (2) who willfully discloses or attempts to disclose to any person the contents of any wire, electronic, or oral communication, knowing, or having reason to know that the information was obtained through interception of a wire. electronic. or oral communication in violation of this section; or (3) who willfully uses or attempts to use the contents of any wire, electronic, or oral communication, knowing, or having reason to know, that the information was obtained through interception of a wire, electronic, or oral communication in violation of this section; shall be imprisoned for not more than five (5) years.
>
> [(b) Omitted]
>
> (c) It shall not be unlawful under this chapter for:
>
> (1) An operator of a switchboard, or an officer, agent, or employee of a communication common carrier, whose facilities are used in the transmission of a wire, electronic, or oral communication, to intercept, disclose, or use that communication in the normal course of his or her employment while engaged in any activity which is a necessary incident to the rendition of his or her service or to the protection of the rights or property of the carrier of the communication. No communication common carrier shall utilize service observing or random monitoring except for mechanical or service quality control checks:
>
> (2) A person acting under color of law to intercept a wire, electronic, or oral communication, where that person is a party to the communication, or where one of the parties to the communication has given prior consent to the interception; or
>
> (3) A person not acting under color of law to intercept a wire, electronic, or oral communication, where the person is a party to the communication, or one of the parties to the communication has given prior consent to the interception unless the communication is intercepted for the purpose of committing any criminal or tortious act in the violation of the constitution or laws of the United States or of any state or for the purpose of committing any other injurious act. (Emphasis added).

Additionally, Chapter 5.1 of Title 12 of the Rhode Island General Laws, entitled



DRAFT

"Interception of Wire and Oral Communications," defines terms used in sec. 11-35-21 and also establishes procedures that must be followed for the interception of wire or oral communications and the disclosure of intercepted communications obtained therefrom. Section 12-5.1-1, et seq., closely parallels the federal wiretap statute, Title III of the federal Omnibus Crime Control and Safe Streets Act, found at 18 U.S.C.A. 2510- 2521.

Thus, in analyzing whether utilization of the Total Recall system in a facility like the Public Safety Complex contravened Rhode Island's "wiretap" statutes, a determination must be made as to whether Total Recall – and its users – impermissibly "intercepted" protected "wire, electronic, or oral communications" as defined in Chapter 5.1 of Title 12. Resolution of this inquiry is dependent upon an analysis of the precise statutory definitions found in Chapter 5.1 of Title 12 and applicable case law.

At the outset, it should be noted that recording systems, like Total Recall, are frequently used in public facilities like the Providence Public Safety Complex for legitimate business purposes. Courts have noted that public safety agencies, like police and fire departments, commonly use such systems "due to the need to preserve and be capable of accurately recalling messages pertaining to emergencies or to official police business." Jandak v. Village of Brookfield, 520 F.Supp. 815, 822 (D.C. Ill. 1981). "[Recorded] calls may constitute vital evidence or leads to evidence, and monitoring them is also necessary for evaluating the speed and adequacy of the response of the police to tips, complaints, and calls for emergency assistance." Amati v. City of Woodstock, 176 F.3d 952, 954 (7th Cir. 1999). Consequently, a plethora of federal case law has evolved under Title III of the federal Omnibus Crime Control and Safe Streets Act, 18 U.S.C.A. 2510- 2521, relating to litigation concerning recordings made through the use of such telephone recording systems.

An initial consideration is whether the telephone calls recorded by Total Recall fit within the statutory definition of protected "wire, electronic, or oral communications." Sec. 12-5.1-1(10) defines "Oral communications" as "any oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation, but the term does not include any electronic communication." (Emphasis added). Based upon this definition, a colorable



DRAFT

argument could be made that many of the conversations recorded by Total Recall do not constitute "oral communications" within the meaning of sec. 12-5.1-1(10) because many callers from within the Public Safety Complex were likely aware of the fact that their calls were being recorded. As stated earlier, prior to moving into the new Public Safety Complex, Major Simoneau of the Providence Police Department sent out a department-wide email on July 22, 2002 that contained, inter alia, the following notification, "Know that all telephone lines in the new station are recorded and thus speak professionally at all times. [Desk Sergeants] please alert all of your clerks of this fact." From the recipient list relating to this email, it appears that this email was delivered to and received by over 500 Police Department and Telecommunications Department personnel. Additionally, as stated earlier, it appears that it was generally acknowledged by personnel housed in the Public Safety Complex that telephone lines within the new facility were recorded, though the extent of the recordings may not have been fully understood. Because of this general awareness, it could be argued that the recorded calls were not "oral communications" within the meaning of the statute since Public Safety Complex personnel that were informed – or suspected – their calls were recorded would not be "[persons] exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation."

Based upon the current state of the evidence, however, it is impossible to discern who within the Public Safety Complex had actual knowledge – as opposed to a "hunch" or a "generalized suspicion" – that their telephone conversations were being continually recorded. Although Major Simoneau's email was sent to – and apparently received by – numerous members of the Providence Police Department, it does not appear that comparable notice was given to personnel in the Fire Department and Office of the Commissioner of Public Safety by the respective leadership in those agencies, although they apparently attended planning meetings at which telephone recording was discussed.

Courts that have addressed this issue on the federal level have required a showing that a participant to a recorded conversation had "actual knowledge" that their call was being monitored, rather than a "generalized suspicion," to remove the monitored or

recorded conversation from the statutory ambit of an "oral communication" by negating a justifiable expectation of privacy. When individual privacy rights are implicated, courts that have considered the 'consent' issue have been reluctant to afford an expansive reading to the exception. See, e.g., Jandak v. Village of Brookfield, 520 F.Supp. 815, 820 (D.C. Ill. 1981); United States v. Duncan, 598 F.2d 839, 850 (4th Cir. 1979)[1]. In accord with this reasoning, for the purposes of this analysis all telephone conversations recorded by Total Recall shall be treated as "oral communications" within the meaning of the statute.

Another issue that must be addressed is whether Total Recall or its users "intercepted" the oral communications at issue. Sec. 12-5.1-1(8) defines "Intercept" as "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." The common dictionary definition of "aural" is "of or pertaining to the ear or the sense of hearing." See Webster's New International Dictionary, at 182 (2d ed. unabridged 1957).

Thus, "interception" is contingent upon whether an "aural or other acquisition of the contents" of an oral communication occurred. As noted earlier, Det. Killian's investigation revealed that only a minute percentage of all recorded calls were actually heard by human ears. This raises the question of whether the recording of calls that were never played audibly constitutes an "interception" within the meaning of the relevant statutes, since "interception" requires "aural or other acquisition of the contents of any... oral communication through the use of any electronic. mechanical, or other device." A difference of opinion exists among courts that have considered whether the mere recording of a telephone conversation constitutes an "interception" if the recording is never played audibly. Some jurisdictions have taken the position that only those recorded calls that have been listened to by human ears are "interceptions" within the meaning of

[1] The Duncan court noted. "Certainly the law does not contemplate that the expectation required here shall be one held with the perfect certitude that it is being respected at all times. At some point along the path of developing suspicion it must surely be possible for an originally justified expectation to become unjustified, but just as surely that point is not reached when a first glimmer of generalized suspicion that something Could or Might be amiss is aroused...If by merely creating a generalized suspicion that a victim's communications were possibly being intercepted, while at the same time avoiding detection, an electronic eavesdropper could bootstrap his activity from the proscribed to the permitted." Id.



DRAFT

the statutes because they have been "aurally" acquired. See, e.g., Greenfield v. Kootenai County, 752 F.2d 1387 (9th Cir. 1985). Other jurisdictions have interpreted "aural or other acquisition" to mean that the mere recording of a call, even if not listened to, constitutes an "interception." See, e.g., United States v. Rodriguez, 968 F.2d 130, 136 (2nd Cir. 1992); Sanders v. Robert Bosch Corp. 38 F.3d 736, 740 (4th Cir. 1994); United States v. Truglio, 731 F.2d 1123, 1131 (4th Cir. 1984), cert. denied, 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984); United States v. Seidlitz, 589 F.2d 152, 157 & n. 17 (4th Cir. 1978), cert. denied, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979). Although the Rhode Island Supreme Court – on facts identical to those at issue here – has not yet specifically ruled upon whether mere recording of a telephone call would constitute an "aural or other acquisition" for purposes of "interception" under Rhode Island's law, dictum in relevant Rhode Island cases indicates that recording alone would run afoul of state wiretap statutes.[2] Consequently, all calls recorded by Total Recall, whether or not played audibly, will be treated as having been "aurally" acquired under sec. 12-5.1-1(8) for purposes of this analysis.

A final, and determinative, issue that must be addressed in determining whether Total Recall unlawfully intercepted oral communications is whether the "aural acquisitions" were accomplished through the use of "any electronic, mechanical, or other device." Sec. 12-5.1-1(7) defines "any electronic, mechanical, or other device" as:

> "any device or apparatus which can be used to intercept wire, electronic, or communications, other than:
>
> (i) Any telephone or telegraph instrument, equipment, or facility or any component of telephone or telegraph instruments, equipment, or facilities, furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business, and being used by the subscriber or user in the ordinary course of business, or by an investigative or law enforcement officer in the ordinary course of his or her duties... (Emphasis

[2] In State v. O'Brien, 774 A.2d 89 (R.I. 2001), defendant was convicted of violating sec. 11-35-21 after consensually allowing fraternity brother to secretly videotape defendant's sexual encounter with victim. In holding that audio portion of videotape recorder was an 'intercepting device' under state wiretap statute, the Court adopted the position that "an 'acquisition' occurs at the time [a] recording is made" – but *not* at the time of "the replaying of a previously recorded conversation." Id. at 96, fn. 7 (emphasis in original) (quoting U.S. v. Turk, 526 F.2d 654, 658 (5th Cir. 1976)).



DRAFT

added).

Although it would seem that any telephone recording system is, per se, an "electronic, mechanical, or other device" because it is, by common usage, a "device or apparatus which can be used to intercept wire, electronic, or oral communications," sec. 12-5.1-1(7), and its federal counterpart,[3] exclude from their definition of "electronic, mechanical, or other device" recording systems that are employed to record all calls made by employees of a business or governmental law enforcement agency, like police departments, if the recordings are made routinely in the ordinary course of business, see, e.g., Arias v. Mutual Central Alarm Service, Inc., 202 F.3d 553, (2nd Cir. 2000); Jandak v. Village of Brookfield, 520 F.Supp. 815, 820 (D.C. Ill. 1981); Amati v. City of Woodstock, 176 F.3d 952 (7th Cir. 1999), cert. denied, 120 S.Ct. 445, 528 U.S. 985, 145 L.Ed.2d 362 (1999); United States v. Van Poyck, 77 F.3d 285 (9th Cir. 1996), cert. denied, 117 S.Ct. 276, 519 U.S. 912, 136 L.Ed.2d 199 (1996), and not selectively or for some criminal or malicious purpose. See, e.g., United States v. Townsend, 987 F.2d 927 (2nd Cir. 1993). When interpreting the so-called "ordinary course of business" or "law enforcement" exceptions delineated in the statute, courts have held that such recordings do not constitute an 'interception' if the recording is done through the use of a telephone instrument, equipment or facility, or any component thereof, and the equipment was being used by law enforcement officers in the ordinary course of their duties. Jandak, 520 F.Supp. at 821.

Courts have considered the nature of the recording equipment in question in determining whether such recordings were effectuated through the use of a "telephone instrument, equipment or facility, or any component thereof." Generally, privately purchased recording equipment that is covertly attached to a telephone system to

[3] The comparable federal definition is found at 18 U.S.C. sec. 2510(5) and provides as follows:

> Electronic, mechanical, or other device means any device or apparatus which can be used to intercept a wire or oral communication other than
> (a) any telephone or telegraph instrument, equipment or facility, or any component thereof,
> (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties; …



DRAFT

selectively record calls made on particular telephone lines or by certain individuals is likely to run afoul of the wiretap statutes. See, e.g., United States v. Townsend, 987 F.2d 927 (2nd Cir. 1993). Conversely, integrated recording systems like Total Recall, that are purchased by a business or municipality from a telephone equipment company or telephone services provider, which "indiscriminately and routinely records all activities on established designated lines, and is not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications," will generally be exempted from the wiretap statute under the "ordinary course of business" exception. See, e.g., Arias v. Mutual Central Alarm Service, Inc., 202 F.3d 553, (2nd Cir. 2000)(Dictaphone machine at alarm services company); Jandak v. Village of Brookfield, 520 F.Supp. 815, 820 (D.C. Ill. 1981)(police department)[4]; Amati v. City of Woodstock, 176 F.3d 952 (7th Cir. 1999), cert. denied, 120 S.Ct. 445, 528 U.S. 985, 145 L.Ed.2d 362 (1999)(police department); United States v. Van Poyck, 77 F.3d 285 (9th Cir. 1996), cert. denied, 117 S.Ct. 276, 519 U.S. 912, 136 L.Ed.2d 199 (1996)(inmate detention center)[5].

It should be noted that under the wiretap statutes, the 'ordinary course of business exception' is separate and distinct from the 'consent' exception. Even if the participants to the conversation in a recorded telephone call are unaware that their call is being recorded and have not consented to the recording, the statutory prohibition against interception of oral communications is not offended so long as the recording is done routinely in the ordinary course of business and not for some criminal or malicious purpose. See Amati, 176 F.3d at 955.

VI. Conclusion

[4] Describing the integrated telephone recording system at issue in the case that was used in a police station, the court in Jandak observed. "Such a system indiscriminately and routinely records all activities on established designated lines, and is not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications. There is little doubt that Congress did not intend the statute to apply to routine recording of emergency and investigative calls as an integral component of a police station telephone system..." Id. at 822.

[5] The VanPoyck court succinctly stated. "To record all calls to and from a police department is... a routine police practice. If "ordinary course" of law enforcement includes anything, it includes that." Id. at 955.



DRAFT

Total Recall is an integrated telephone recording system that was used at the Providence Public Safety Complex from May 23, 2002 to February 10, 2003. During this time period, Total Recall routinely and indiscriminately recorded the vast majority of incoming and outgoing calls at the Public Safety Complex.

The credible evidence submitted shows that Manuel Vieira, then-Director of the Telecommunications Department, was the individual who was responsible for the requisitioning, installation, and activation of the Total Recall system. Although it appears that – among many others – Chiefs Prignano and Rattigan and Commissioner Partington were aware that certain lines in the Public Safety Complex would be recorded, the evidence suggests that none of these individuals was fully aware of Total Recall's capabilities or the extent to which lines would be recorded in the Complex, nor did they have any involvement in the requisitioning, installation, or activation of the recording system. It also appears, however, that discussion of a telephone recording system for the Public Safety Complex occurred regularly and openly at planning meetings relating to Complex, that the system was requisitioned and purchased in accordance with normal municipal purchasing procedures, and the system was purchased from a legitimate vendor of telephone products and services as part of a complete telephone system solution for the Public Safety Complex. Lastly, although formal notification was not given to the Chiefs, Commissioner, or Public Safety Complex personnel by the Telecommunications Department regarding the activation of the recording system or the extent of its operation, it appears that many, if not all, Public Safety Complex personnel had some belief – if not actual notice – that calls in the Public Safety Complex were being recorded, and no evidence exists that affirmative steps were taken by personnel at the Telecommunications Department or elsewhere to either refute this belief or quell its propagation.

During its time in operation, Total Recall archived 754,564 calls and, of that total, Detective John Killian determined 83,552 calls had been 'accessed' after their creation, but noted that simply because a call was 'accessed' does not necessarily mean that the audio file of that call was activated and played audibly. Through an exhaustive methodology more fully explained in his Forensic Report, Detective Killian further refined his inquiry to determine which of those accessed calls were accessed and played



DRAFT

audibly with "malicious [or] surreptitious intent" and was unable to find any audio file accesses that fit this criteria. The very small number of accessed calls that were activated and played audibly or downloaded and written on to a compact disc were attributable to legitimate business purposes, and no evidence suggested that any accessed call was played audibly or downloaded and recorded either without the consent of a call participant or for a criminal, malicious, or non-business-related reason. To conclude otherwise in the absence of credible evidence to the contrary would amount to sheer speculation and conjecture.

The submitted evidence shows that Total Recall "indiscriminately and routinely record[ed] all activities on established designated lines, and [was] not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications." As such, use of the Total Recall recording system in the Public Safety Complex falls within the 'ordinary course of business exception' to the state and federal wiretap statutes and, thus, was not an electronic or other device that unlawfully intercepted oral communications in contravention of those statutes.

Although the facts surrounding the requisitioning, installation, and operation of the Total Recall system may show rather unfathomable negligence on the part of certain Providence municipal employees and a disturbing lack of communication between their respective agencies, the facts do not show probable cause to believe that a prosecutable violation of the Rhode Island General Laws occurred. Accordingly, it is recommended that no charges be filed against anyone in relation to the requisitioning, installation, and operation of Total Recall. In the event that Total Recall is reactivated and further recording of telephone lines occurs at the Public Safety Complex, however, it is recommended that the leadership of the agencies housed therein and the Telecommunications Department consult with the Providence City Solicitor to develop an official written policy relating to the use of Total Recall within the Public Safety Complex and that the policy be disseminated to all personnel that will be effected by it.



DRAFT

Respectfully submitted,

RONALD R. GENDRON



DRAFT