UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.

vs. C.A. No. 2004-304S

URBANO PRIGNANO, JR., et als.

---

THOMAS C. CHMURA, et als.

vs. C.A. No. 2004-553S

URBANO PRIGNANO, JR., et als.

DEPOSITION OF JOSEPH P. RICHARDSON, JR., a Defendant in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Providence City Solicitor, 275 Westminster Street, Providence, Rhode Island on February 27, 2006 at 2:00 P.M.

Attachment "D"

ALLIED COURT REPORTERS, INC.

115 PHENIX AVENUE

CRANSTON, RHODE ISLAND 02920

(401) 946-5500

answered.
MR. McALLISTER: Objection. Asked and answered.
Ms. MANNIS: Not answered. It was asked.
MR. McALLISTER: You might not like the answer, but he answered.
MS. MANNIS: I don't believe he answered the question. Yes or no, he either was or wasn't.
MR. CRONIN: He said no. You can look at the record, he said no.
Q. Yes or no?
A. No.
MR. WEST: Objection.
MR. ROBINSON: Objection.
MR. WEST: Move to strike.
MS. MANNIS: There is no one here to strike it.
MR. WEST: I'm making a note for the record. It's perfectly appropriate deposition procedure.
Q. What was your title after September 2001 for the City of Providence?
A. I don't know that we had titles.



Q. Was your computer seized by the police after the Total Recall system was disclosed to the public?
MR. WEST: Objection as to form.
MR. McALLISTER: Objection to form.
A. I'm not sure what you're asking.
Q. Was your computer ever seized by the police?
MR. WEST: Objection to form.
MR. McALLISTER: Objection to form.
A. I was told that computers were seized, and I think I recall Detective Killian telling me.
Q. Do you know what happened to them?
A. No.
Q. When did you leave the employment of the city?
A. It was some time in February of 2003.
Q. Do you remember when in February 2003?
A. I don't remember the date exactly.
Q. Was it after September 10, 2003?
A. I'm just not sure of the date.
Q. What were the circumstances under which you no longer were employed by the City of Providence?
A. I was asked to resign by the Mayor.
Q. Did he tell you the reasons why he wanted you to resign?
A. He said he had some difficulties with the management in communications, and he was making a



complete change.
Q. Do you recall if this was before or after the Total Recall system became published in the Providence Journal?
A. I think it was after.
Q. Did you tender your resignation?
A. Yes, I did.
Q. Was it effective immediately; did you leave two weeks later?
A. It was effective immediately. I was actually giving a statement to the State Police in my home when Mayor Cicciline called me.
Q. If I show you a copy of a statement, would this refresh your recollection as to the date?
MR. WEST: Date of what?
MS. MANNIS: The date he resigned.
MR. McHUGH: Is that his statement, the witness statement?
MS. MANNIS: Yes.
MR. SANTOPIETRO: Is that 2-18-03?
MR. McALLISTER: It appears to be.
Q. Is that the statement you were referring to?
A. Yes, correct.
Q. So provided that that is dated correctly, would that indicate the date that you resigned?



MR. McHUGH: Objection as to form.
A. It may have been. The day I was giving this statement in my home to Detective Killian, was the date that I received a phone call and was asked to resign and a police officer was sent to my home and he gave me a copy of a resignation letter that I signed.
Q. Do you know what the letter said?
A. I don't remember the wording. I recall it to be brief.
Q. Prior to your being transferred to the task force, what were the policies and procedures for recording calls that came in to either the fire department or the police department?
MR. SANTOPIETRO: Objection to form.
MR. WEST: Objection.
MR. McHUGH: Objection. Form.
MR. McALLISTER: Objection to form. You can answer.
THE WITNESS: Can you repeat the question for me, please?
Q. Take them one at a time, because the objection is probably that it's compound. Prior to your being sent to this task force in September of 2001 --
A. Public security task force.

was referring to.
Q. Do you recall saying to the police there's no way Sullivan or Simmoneau is going to tell you they wanted, you know, bathroom lines done and, you know, why would they want their own phone lines recorded?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. McALLISTER: Objection. Form. Context.
A. I'm not sure what the question is.
Q. I'm asking you if you recall saying that to the police?
THE WITNESS: Saying what again, please?
MR. WEST: Objection to form.
Q. "There is no way Sullivan and Simmoneau are going to tell you that they wanted, you know, bathroom lines done and, you know, why would they want their own phone lines recorded."
MR. SANTOPIETRO: Objection.
MR. WEST: Objection to form.
MR. McHUGH: Objection.
MR. McALLISTER: Objection.
A. I believe I had a discussion and when I gave



my statement to Detective Killian, which was characterizing my conversation with Director Viera, and I was asking about those specific emergency calls for service, and I think that's how I characterized it, saying, for example, that, you know, we wouldn't be recording bathroom lines, you know, or their private lines, their personal lines. I think that's the nature. If you're saying did I say that to the State Police, yes, I did. That's how I was characterizing it --
Q. Then did you tell the police that Manuel Viera said that's the way they wanted it?
MR. SANTOPIETRO: Objection.
A. I do recall him saying that.
Q. Who saying that?
A. Director Viera.
Q. So do you recall having a conversation with Mr. Viera whereby you indicated that there's no way that Sullivan or Simmoneau are going to tell you that they wanted, you know, bathroom lines down and, you know, why would they want their own phone lines recorded and he said that's just the way they wanted it?
MR. SANTOPIETRO: Objection.
MR. ROBINSON: Objection.



MR. McHUGH: Objection.
MR. WEST: Objection.
MR. McALLISTER: Objection.
A. Yes, I did have that conversation.
Q. When did you have that conversation with Manuel Viera?
A. Once again, in that period of time. I don't recall the exact date and time. It was around the time that we were inquiring about those lines with Chief Dutra, Chief Lanzi and Chief Rattigan.
Q. Do you recall telling the police that Colonel Prignano wanted it?
THE WITNESS: Did I say that?
MR. McHUGH: Objection.
MS. CARLIN: Objection.
A. No.
Q. You don't recall saying that to the police, that Manuel Viera said that to you?
A. That's not what you asked me.
MR. McHUGH: Objection.
MR. McALLISTER: Objection.
MS. CARLIN: Objection.
MR. ROBINSON: Objection.
THE WITNESS: Can you ask the question again please?



Q. Do you recall telling the police that Colonel Prignano -- that Manuel Viera told you that Colonel Prignano wanted all those calls recorded?
MR. WEST: Objection.
MS. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MS. CARLIN: Objection to form.
A. I recall saying that to Detective Killian.
Q. Do you recall Manuel Viera saying that to you?
MR. WEST: Objection.
MR. SANTOPIETRO: Objection.
MR. ROBINSON: Objection to form.
A. Yes.
Q. Did you have a password to the Total Recall system?
A. No.
Q. Did you ever direct a technician to remove a line from being recorded?
MR. McALLISTER: Objection to form.
A. No.
Q. Did you attend a meeting with Andy Rosenswag (phonetic) on February 10, 2003?
A. I'm not sure of the date, but I was at a meeting with Esserman and Rosenswag and people from communications, if that's the meeting you're

referring to.
Q. Was Major Sullivan and Laurenza (phonetic) there?
A. I believe so.
Q. Lieutenant Keith Tucker from IA?
A. Yes, I believe so.
Q. Manny Viera was there?
A. Yes.
Q. Is it your recollection that Dean Esserman was there?
A. If it's the meeting I'm thinking of.
Q. Was the Mayor there?
A. No.
Q. This memo refers to you as Deputy Director Joe Richardson, do you believe that to be yourself?
MR. WEST: Objection to form.
MR. ROBINSON: What memo?
A. My name is Joe Richardson.
MR. WEST: What memo?
Q. Since you left the employment of the city, have you had any conversations with Manuel Viera?
A. No.
Q. Have you had any conversations since you left the employment of the city with Mary Lennon?
A. Yes.
Q. When was the last time you spoke with her?



A. Approximately three years ago.
Q. Was it shortly after you left the city's employment?
A. Yes.
Q. What was the nature of that conversation?
A. She asked me if I would give her a job recommendation.
Q. And did you?
A. Yes.
Q. Since the institution of the lawsuit in question here, you know which lawsuit I'm referring to?
A. I think so.
Q. Have you had any conversations with Mary Lennon?
A. No.
Q. Have you had any conversations with any of the other defendants in this lawsuit since the inception of the lawsuit?
THE WITNESS: Can you tell me just so I'm sure who you're referring to?
Q. Urbano Prignano, Jr.?
A. No.
Q. David Cicciline?
A. No.
Q. Dean Esserman?
A. No.



Q. Vincent Cianci?
A. No.
Q. Manuel Viera?
A. No.
Q. We already discussed Mary Lennon, and you're Joseph Richardson. Steven Napolitano?
A. No.
Q. Do you know any of the plaintiffs in the lawsuit?
A. Yes.
Q. Have you had any discussions with any of the plaintiffs regarding this lawsuit?
A. Yes.
Q. Which plaintiffs?
A. James Rock.
Q. Who is James Rock?
A. Firefighter.
Q. When was the last time you spoke with him regarding this lawsuit?
A. It was shortly after I was noticed -- notified of the lawsuit. He teaches my sons, my children piano. He's a piano teacher in addition to being a firefighter.
Q. And what was the substance of the conversation that you had with James Rock?
A. I approached him when I was served notice of



the lawsuit and thought about it for a while and discussed it with my wife, and I came to a decision and I told him that I hoped that this lawsuit wasn't going to impact his relationship with my children teaching them piano.
Q. Did you discuss the substance of the lawsuit?
A. He said, "What lawsuit?" I said, "You're suing me." He said, "Well, that's just something to do with the city." I said, "Well, you're suing me personally, and me and my wife have decided that I just didn't want it to affect my kids." That's the last time I discussed it with him.
Q. Did you continue to use his services to teach your children piano?
A. He still teaches my youngest son piano, yes, he does.
Q. Have you had any conversations with any other plaintiffs regarding this lawsuit?
A. I don't think so.
Q. Are you aware that Major Simmoneau sent out an E-mail communication regarding the taping of telephone calls at the new Public Safety Complex?
MR. WEST: Objection as to form.
A. I was made aware of that.
Q. When were you first made aware of it?